# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

KIMBERLY SARVER,

        Plaintiff,

v.                                              Civil Action No. 2:14-cv-19968

JOHNSON & JOHNSON, ET AL.,

        Defendants.

### MEMORANDUM OPINION AND ORDER
### (Motion to Dismiss for Lack of Personal Jurisdiction)

Pending before the court is defendant Proxy Biomedical, Ltd.'s ("Proxy") Motion to Dismiss for Lack of Personal Jurisdiction ("12(b)(2) Mot.") [ECF No. 9]. The plaintiffs have responded, Pl.'s Opp'n to Proxy's 12(b)(2) Mot. to Dismiss for Lack of Personal Jurisdiction ("Pl.'s Opp'n.") [ECF No. 12], and the defendants have replied, Def.'s Reply to Pl.'s Opp'n. ("Def.'s Reply") [ECF No. 15]. Thus, this motion is now ripe for review. For the reasons stated below, Proxy's Motion to Dismiss [ECF No. 9] is **GRANTED**.

## I. BACKGROUND

This case resides in one of seven MDLs assigned to me by the Judicial Panel on Multidistrict Litigation concerning the use of transvaginal surgical mesh to treat pelvic organ prolapse ("POP") and stress urinary incontinence ("SUI"). In the seven MDLs, there are nearly 70,000 cases currently pending, approximately 25,000 of which are in the Ethicon, Inc. MDL, MDL 2327.

In the case at bar, plaintiff Kimberly Sarver, a resident of Georgia, filed suit against Johnson & Johnson, Ethicon, Inc., Ethicon, LLC, Boston Scientific Corporation, and Proxy in the United States District Court for the District of New Jersey. Compl. 1 [ECF No. 1]. Subsequently, the Judicial Panel on Multidistrict Litigation transferred the case to this district and assigned it to the Ethicon, Inc. ("Ethicon") MDL, MDL 2327. Conditional Transfer Order [ECF No. 3]. The complaint alleges that Ms. Sarver suffered personal injuries as a result of the implantation of pelvic mesh—specifically, the Gynecare Exact System ("Gynecare") and Polyform Synthetic Mesh ("Polyform"). Compl. 4-5 [ECF No. 1].

Proxy manufactures Polyform, a non-absorbable synthetic mesh constructed of knitted filaments of polypropylene. *See* Pretrial Order # 41, 3 [ECF No. 12-1], MDL No. 2326. It is supplied in sterile, sheet form to be cut to size and sutured by a surgeon to meet an individual patient's needs. *Id.* Proxy then sells Polyform to Boston Scientific in Galway, Ireland pursuant to orders Boston Scientific sends to Galway, Ireland. *Id.* at 4. Proxy then ships Polyform to Boston Scientific's distribution center in Quincy, Massachusetts. *Id.* Ultimately, Boston Scientific uses Polyform in products such as the Pinnacle Pelvic Floor Repair Kit and the Uphold Vaginal Support System. *Id.* at 5 n.2. Boston Scientific has an exclusive licensing agreement to distribute Proxy's Polyform, and Proxy has no involvement in the sale or marketing of Polyform after it is shipped to Boston Scientific. *Id.* at 6.

Section 510(k) of the Food, Drug and Cosmetic Act ("FDA") requires device manufacturers, unless exempted, to notify the FDA of their intent to market a medical device in the United States at least 90 days in advance of such marketing. *See* Pretrial Order # 41, 3 [ECF No. 12-1], MDL No. 2326 (citing Federal Food, Drug, and Cosmetic Act, Pub. L. No. 75-717, § 510(k), 52 Stat. 1040 (1938), as amended 21 U.S.C. § 360(k) (2012)). This application is known

as a pre-market notification. *Id.* (citing 21 C.F.R. § 807.92(a)(3) (2012)). If the FDA finds the device to be "substantially equivalent" to a legally marketed device that is not subject to pre-market approval, the FDA will allow the device to be marketed. *Id.* at 3–4. Proxy filed a 510(k) for Polyform in May of 2005, and the FDA approved the application on or around June 17, 2005. *Id.* at 4. However, Proxy does not hold the 510(k) clearance for any finished products at issue in these MDLs. *Id.* at 6. Further, the plaintiff does not specify which Boston Scientific product is at issue in this particular case.

Proxy argues that Ms. Sarver's Complaint "fails to set forth the minimum contacts necessary to establish personal jurisdiction," Proxy's Mot. to Dismiss & Mem. of Law in Supp. 2 ("Pl.'s Mem. in Supp.") [ECF No. 10], and thus moves for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(2). *Id.* In response to Proxy's Motion, the plaintiff contends that Proxy has established minimum contacts with New Jersey to allow the transferor court in New Jersey to exercise personal jurisdiction under the theories of both general and specific jurisdiction. Pl.'s Opp'n. [ECF No. 12].

## II. APPLICABLE LEGAL STANDARDS AND CHOICE OF LAW

### A. Motion to Dismiss

When a defendant moves to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, "the plaintiff [must prove] to the district court judge the existence of jurisdiction over the defendant by a preponderance of the evidence." *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005). The Fourth Circuit has consistently stated that "[w]hen a district court considers a question of personal jurisdiction . . . , the plaintiff has the burden of making a prima facie showing in support of its assertion of jurisdiction." *Universal Leather, L.L.C. v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir.

2014) (citing *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009)). "In considering whether the plaintiff has met this burden, the district court 'must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction.'" *Id.* (citing *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)).

### B. Choice of Law

Under 28 U.S.C. § 1407, this court has authority to rule on pretrial motions in MDL cases. This case has been transferred from the District of New Jersey to the Southern District of West Virginia, MDL 2327. Accordingly, I apply the law of the Fourth Circuit to issues dealing with federal procedure. *See In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 97 F.3d 1050, 1055 (8th Cir. 1996) ("When analyzing questions of federal law, the transferee court should apply the law of the circuit in which it is located." (citation omitted)).

Because a federal court looks to state law when determining whether it may exercise personal jurisdiction over a litigant, I also apply the substantive law of New Jersey to the issue of personal jurisdiction. *See In re Hydroxycut Mktg. & Sales Practices Litig.*, 810 F. Supp. 2d 1100, 1106 (S.D. Cal. 2011) (noting "the MDL court applies the law of the transferor forum to determine personal jurisdiction"); *In re Papst Licensing GMBH & Co. KG Litig.*, 602 F. Supp. 2d 10, 14 (D.D.C. 2009) (same). New Jersey's long-arm statute "permits the exercise of personal jurisdiction to the fullest limits of due process." *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir. 1998) (citation omitted). "[T]he New Jersey Supreme Court has made it clear that New Jersey courts look to federal law for the interpretation of the limits on [personal jurisdiction]." *Id.* Thus, there is no need for further analysis of New Jersey law, and I consider the "limits imposed by federal due process." *Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014) (discussing application

4

of California's long-arm statute) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 464 (1985)).

### C. Personal Jurisdiction

For a district court to validly assert personal jurisdiction over a non-resident defendant, two conditions must be satisfied. First, a state long-arm statute must authorize jurisdiction over the non-resident defendant. Second, the court's exercise of personal jurisdiction over the non-resident defendant must "comport with the Due Process Clause." *In re Celotex Corp.,* 124 F.3d 619, 627 (4th Cir. 1997); *Mylan Labs., Inc. v. Akzo, N.V.,* 2 F.3d 56, 59–60 (4th Cir. 1993). Where a state's long-arm statute is coextensive with the full reach of due process, "it is unnecessary in this case to go through the normal two-step formula for determining the existence of personal jurisdiction." *Celotex,* 124 F.3d at 627–28 (internal citations omitted); *see also Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014) (interpreting California's long-arm statute). Consequently, the statutory inquiry merges with the constitutional inquiry, and the court must determine whether exercising personal jurisdiction over the defendant is consistent with the Due Process Clause. *See id.*

"A court's exercise of personal jurisdiction over a non-resident defendant is consistent with the Due Process Clause if the defendant has sufficient 'minimum contacts' with the forum such that requiring the defendant to defend its interests in the forum does not 'offend traditional notions of fair play and substantial justice.'" *Celotex,* 124 F.3d at 628 (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)). The Supreme Court has recognized that this protection provided by the Due Process Clause extends to foreign corporations. *See Goodyear Dunlop Tires Ops., S.A. v. Brown*, 131 S. Ct. 2846, 2852–54 (2011).

There are two approaches for a court to find personal jurisdiction over persons outside a state's borders: specific and general jurisdiction. *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.,*

293 F.3d 707, 711 (4th Cir. 2002). If the defendant's contact with the state is the basis of the suit, then specific jurisdiction applies. *Id.* The Fourth Circuit applies a three-part inquiry to determine whether specific jurisdiction exists; the inquiry looks to: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiff's claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Mitrano v. Hawes*, 377 F.3d 402, 407 (4th Cir. 2004). The "touchstone" of the specific jurisdiction analysis is whether the defendant "engaged in some activity purposefully directed toward the forum state." *Celotex,* 124 F.3d at 628 (internal quotations omitted).

If the suit does not arise out of the defendant's contacts with the state, the defendant must have "continuous and systematic" contacts with the state to confer general jurisdiction. *ALS Scan, Inc.*, 293 F.3d at 712. To find general jurisdiction exists, the defendant's contacts with New Jersey must be so "continuous and systematic" that the defendant may be "fairly regarded as at home" in the forum state and thus answerable there for any and all claims. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2854 (2011). In a recent case addressing general jurisdiction, the Supreme Court reiterated the thrust of *Goodyear* when describing where corporations are typically "at home":

> [T]he place of incorporation and principal place of business are paradig[m] . . . bases for general jurisdiction. Those affiliations have the virtue of being unique—that is, each ordinarily indicates only one place—as well as easily ascertainable. These bases afford plaintiffs recourse to at least one clear and certain forum in which a corporate defendant may be sued on any and all claims.

*Daimler*, 134 S. Ct. at 760 (internal quotation marks and citations omitted). The Court added that "*Goodyear* did not hold that a corporation may be subject to general jurisdiction *only* in a forum where it is incorporated or has its principal place of business," *Daimler*, 134 S. Ct. at 760,

acknowledging corporate defendants can be hauled into court outside their home jurisdictions based on unrelated contacts under the right circumstances.

## III. DISCUSSION

### A. General Jurisdiction

Proxy is organized under the laws of Ireland, with its principal place of business in Galway, Ireland. "Further, Proxy Ltd. does not transact business in New Jersey, does not have a registered agent in New Jersey, does not maintain an office or business facility in New Jersey, does not advertise in New Jersey, does not own, lease, or possess any real property in New Jersey, and does not have post office boxes, telephone listings, or bank accounts in New Jersey." Pl.'s Mem. in Supp. 9 [ECF No. 10]. Ms. Sarver argues that Proxy is subject to general jurisdiction in New Jersey because of its distribution partnership with Maquet Vascular Systems ("Maquet"), a party not relevant to the present litigation. Pl.'s Opp'n. 8-10 [ECF No. 12]. Under the terms of this agreement, Maquet would "distribute Proxy's VitaMESH and VitaMESH Blue meshes to surgeons throughout the world." *Id*. at 4. The plaintiff reasons that because Maquet is headquartered in New Jersey, this relationship is sufficient to establish general jurisdiction.

A distribution partnership for a mesh distinct from the one at issue, however, is insufficient to establish an affiliation that is so "continuous and systematic" as to render Proxy "essentially at home" in New Jersey. *See Goodyear*, 131 S. Ct. at 2851; *and Daimler AG*, 134 S.Ct. at 757. In other words, New Jersey courts may not constitutionally exercise general jurisdiction over Proxy.

### B. Specific Jurisdiction

Thus, the inquiry centers on whether Proxy is subject to specific jurisdiction in New Jersey, which Proxy disputes. In this regard, Ms. Sarver contends that Proxy's availment of (1) the 510(k) clearance process and (2) Boston Scientific's nationwide sales force establishes minimum contacts

with New Jersey. Pl.'s Opp'n 5-6 [ECF No. 12]. To support her first point, Ms. Sarver argues that Proxy "maintained responsibility for obtaining, maintaining and complying with all United States regulatory requirements and approvals, reporting all adverse events with its devices to the FDA, and delivering to the FDA all required annual and periodic reports." *Id.* at 6 (quotations omitted). Further, Ms. Sarver points out that "Proxy never asked Boston Scientific, it's U.S. distributor, to withdraw from or avoid the New Jersey market." *Id.*

A recent decision of the United States Supreme Court is relevant to the personal jurisdiction analysis. In *J. McIntyre Machinery, Ltd. v. Nicastro,* the United States Supreme Court considered whether New Jersey had personal jurisdiction over a foreign manufacturer. 131 S. Ct. 2780, 2785 (2011). The New Jersey Supreme Court found that New Jersey's courts could exercise personal jurisdiction over a foreign manufacturer "so long as the manufacturer 'knows or reasonably should know that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states.'" *Id.* (quoting Nicastro v. McIntyre Mach. Am., Ltd., 201 N.J. 48, 76–77, 987 A.2d 575, 591–92 (2010)). Applying this logic, the New Jersey Supreme Court "concluded that a British manufacturer of scrap metal machines was subject to jurisdiction in New Jersey, even though at no time had it advertised in, sent goods to, or in any relevant sense targeted the State." *Id.* The United States Supreme Court reversed, finding no personal jurisdiction. *Id.* (plurality opinion); *id.* at 2791 (concurring opinion).

In *McIntyre*, Nicastro's counsel stated several facts in support of the state's jurisdiction, chiefly: J. McIntyre used an independent distributor that willingly chose to sell J. Mcintyre's machines in the United States, J. McIntyre officials attended annual conventions to advertise J. McIntyre machines in various states, but never New Jersey, no more than four machines ended up in New Jersey, and J. McIntyre held the patents on its technology. *Id.* at 2786.

Justice Kennedy, in reviewing the Supreme Court's jurisprudence on personal jurisdiction, recognized that a "defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted its goods will reach the forum State." *Id.* at 2788. Furthermore, "personal jurisdiction requires a forum-by-forum, or sovereign-by-sovereign, analysis." *Id.* at 2789. Justice Kennedy specifically recognized in the context of the case before the Court, "[h]ere the question concerns the authority of a New Jersey state court to exercise jurisdiction, so it is petitioner's purposeful contacts with New Jersey, not with the United States, that alone are relevant." *Id.* at 2790. He found that the facts recited above "reveal an intent to serve the U.S. market, but they do not show that J. McIntyre purposefully availed itself of the New Jersey market." *Id.*

Likewise, Justice Breyer found the facts insufficient to demonstrate that it was "constitutionally proper to exercise jurisdiction over petitioner J. McIntyre . . . ." *Id.* at 2791. Justice Breyer did not find the "something more" that is required under Supreme Court precedent. *Id.* There were no regular sales in New Jersey, no "special state-related design, advertising, advice, marketing, or anything else." *Id.* Furthermore, Justice Breyer found that J. McIntyre had not otherwise purposefully availed itself within New Jersey, and it had not "delivered its goods in the stream of commerce 'with the expectation that they will be purchased' by New Jersey users." *Id.* (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–298 (1980)).

Justice Breyer did not join in the plurality opinion's reasoning because he argued the case could be determined by the Court's precedents. *Id.* at 2791. Justice Breyer found it too strict to preclude jurisdiction in every case "where a defendant 'does not inten[d] to submit to the power

of a sovereign' and cannot 'be said to have targeted the forum,'" especially in light of the issues presented by sales over the internet. *Id.* at 2793 (quoting *id.* at 2788). And he did not agree with the New Jersey Supreme Court because its reasoning was too broad, subjecting a defendant to jurisdiction if it "knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states." *Id.* (citation omitted). Justice Breyer was concerned that such a blanket rule failed to take into account the size of the manufacturer, the distance of the forum, and the number of items that end up in the particular forum. *Id.* He continued, "the fact that the defendant is a foreign, rather than a domestic, manufacturer makes the basic fairness of an absolute rule yet more uncertain." *Id.* at 2793–94.

The contacts in *McIntyre* largely parallel those that Proxy has with New Jersey in this case. There are some differences, but those differences do not militate in favor of finding that Proxy purposefully availed itself of New Jersey's laws. Proxy differs most from J. McIntyre in that Proxy complied with certain FDA regulations that indicated its intent to market Polyform in the United States. However, the alleged contact established by Proxy's submission of Polyform to the FDA is with the United States in general, not any specific state. The facts suggest nothing more than the possibility that Proxy products *might* be sold in New Jersey, which the Supreme Court rejected as grounds for specific jurisdiction in *McIntyre*. *Id.* at 2788 (Kennedy, J., plurality) ("[A]s a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State."); 131 S. Ct. at 2793 (Breyer, J., concurring in judgment) (disagreeing with the proposition that a defendant that "'knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty

states'" is subject to personal jurisdiction for a products-liability action (quoting *Nicastro v. McIntyre Mach. Am.*, 201 N.J. 48, 76–77, 987 A.2d 575, 592 (2010)).

The plaintiffs attempt to offer case law in support of their argument that knowingly placing products into a "stream of commerce" where the product is likely to end up in that state is enough of a contact with a forum state to satisfy the "minimum contacts" analysis. *See* Pl.'s Opp'n. 1-2, 5-6 [ECF No. 12]. Specifically, the plaintiffs cite *Estes v. Midwest Products, Inc.,* 24 F. Supp. 2d 621, 630 (S.D. W. Va. 1998), and a thirty year old New Jersey Supreme Court case, *Charles Gendler & Co. v. Telecom Equip. Corp.*, 508 A.2d 1127 (1986). These cases are readily distinguishable because they were decided long before *J. McIntyre*.[1] Furthermore, the defendant in *Estes* manufactured a finished product, and its "intent and purpose [were] completely revealed in its decision to sell through national retail chains." 24 F. Supp. 2d 621, 630 (S.D. W. Va. 1998). I reasoned that, "the defendant structure[d] its primary conduct with genuine assurance that its activities [would] render them liable to suit in West Virginia. It is the difference between shipment and setting adrift." *Id.* Consequently, I concluded that the defendant's sale of finished products to national retailers that have stores in West Virginia constituted a substantial connection to West Virginia that was purposefully directed toward West Virginia. *Id.* 24 F. Supp. 2d 621, 630 (S.D. W. Va. 1998). This is a far cry from Proxy's contacts with New Jersey.

The contacts that would be relevant to a finding that New Jersey has specific jurisdiction over Proxy are lacking in this case. Proxy sold Polyform and unfinished bulk mesh in Ireland to Boston Scientific and shipped the products to Massachusetts to be incorporated into finished

---

[1] Given the extent to which the parties address *Estes* in forming their respective arguments, I find it beneficial to factually distinguish *Estes* from the instant matter. I am, however, somewhat skeptical that *Estes* has any continuing vitality after the Supreme Court's *J. McIntyre* decision. *See J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 2791 (2011) ("[T]he stream-of-commerce metaphor cannot supersede either the mandate of the Due Process Clause or the limits on judicial authority that Clause ensures…[T]he Constitution commands restraint before discarding liberty in the name of expediency.")

products. Proxy has no input on the sale and marketing of its product after it is shipped to Boston Scientific. Even if Boston Scientific distributed the finished products to all fifty states, this would not be enough, without more, for New Jersey to exert personal jurisdiction. Thus, the facts favor in finding that any contacts with New Jersey were a result of Proxy setting its products adrift, which is not enough for this court to exercise personal jurisdiction over it. *See Celotex*, 124 F.3d at 628 (finding that the "touchstone" of the specific jurisdiction analysis is whether the defendant "engaged in some activity purposefully directed toward the forum state") (internal quotations omitted); *see also Crowell v. Analytic Biosurgical Solutions*, 2013 WL 3894999 *5 (S.D. W. Va. July 26, 2013) ("Thus, the facts favor a finding that any contacts [defendants had] with Tennessee were a result of [defendants] setting its products adrift, which is not enough for this court to exercise personal jurisdiction over it.").

## IV. CONCLUSION

Because I **FIND** the plaintiff does not meet her burden in proving defendant Proxy has sufficient "minimum contacts" with the forum state, a "fair play and substantial justice" due process analysis is unnecessary. This court may not constitutionally exert personal jurisdiction over Proxy Biomedical, Ltd., in this case that was transferred from the District of New Jersey. Pursuant to Fed. R. Civ. P. 12(b)(2), it is **ORDERED** that Proxy's Motion to Dismiss for Lack of Personal Jurisdiction [ECF No. 9] is **GRANTED**.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        February 5, 2016

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

12